Good afternoon, your honors. May it please the court, I'd like to get straight into what I believe is at the heart of this appeal, and that is the question of reasonable expectation. Under this court's precedence, RLUIPA, Substantial Burdens Provision, has been interpreted to provide a claim under certain circumstances. Number one, would it serve an unmet religious need? Number two, was the denial absolute? Number three, which has been really added here, whose fault was this decision? Was it the church or religious organization at issue, knowing whether or not allowed, or was it the government's fault for denying that it had to be? The language regulations here, I think, I believe are clear. First of all, nobody disagrees that the use is permitted on this property by right. That's not an issue. What is at issue are the question of these master plans, two different master plans that work together and further regulate the use on this property. The Burtonsville Neighborhood Crossing Plan, which I'll just refer to as the BCNP, is the local master plan. Again, nobody disagrees that it recommends against sewer access for this particular property, but it says another thing as well. Can I just ask you to use the phrase there, words matter here, that it recommends against. I read it as barring sewer, and so help me understand why instead of barring sewer, you think it should just be read to be a recommendation or, you know, suggestion. Sure. Well, there's two answers to that, Your Honor. Number one is, it's a master plan, it's not a law. Now, under Maryland law, a lot of master plans do have the force of law. Their recommendations have the force of law under certain circumstances, such as this. But the other, and that's why I'm technically referring to it as a recommendation instead of having, being a regulation or a law itself. The second, I think, more important answer is what the BCNP also does, and it also says that access to sewer services, that it supports the use of sewer service, public sewer service, consistent with the service policy in the county's main comprehensive water supply and sewer system plan, which I'll just refer to as the water and sewer plan. So it says no sewer to this area, but it also says we support the service policies in the water and sewer plan. And that's where we get to the heart of the matter. The water and sewer plan says that if you're a PIP and you're outside of the sewer envelope, because you're a PIP, because you're a nonprofit institution, you get a certain benefit. That benefit is, if you meet the specific objective criteria, you get access to sewer. And that is clear from the text. There's no limitation on that provision, either the water and sewer plan or the BCNP. And importantly, that's exactly how the county has interpreted that provision through other applications in the past, including in the year or two before it became an application. The court has granted sewer access to other applicants because they were PIPs, notwithstanding specific recommendations that say no sewer service to that property. Now, the county has, that's another critical point here, your honors, the county has... Can I go back and just make sure that I'm following? In the BCNP, you say that, you know, I believe you're paying on page 709, that it but that's immediately followed by saying the plan recommends against providing public sewer for rural edge properties under any circumstance, right? So why wouldn't we think of that just being that the specific obviously governs the general? I, because I believe that they are addressing, they are, one is addressing these specific service policies, one is addressing specific conditions where the properties are located. The way to resolve if there is conflict, if they are somewhat inconsistent, is how has the county, how has the state interpreted those provisions in the past? And the way they have reconciled those provisions is by understanding that the PIPs do get the benefit of the service policy, even if there are specific recommendations like that in the local master plan. The MDE, after a consultation with the Maryland Department of Planning, has looked at two other applications, the Shremangal application and the Glenstone application cited in our materials, where there were similarly specific recommendations and said that the requests were consistent with the master plans and the PIP policy. The county has repeatedly referred to this MDE saying that the state wouldn't allow approval of this when the state itself has said that in similar circumstances it doesn't have a problem with that. It finds it consistent to be with those with those plans. That's a critical point here. The other reason why this, any perceived inconsistency is easily reconcilable with this county's own position. The county has said if you have a general recommendation in a local master plan against sewer access, that can be overcome by the PIP policy, but a specific recommendation cannot. And there's absolutely no basis for such distinction. There's nothing in the text. The county has never applied it that way prior to the Canaan application and, you know, the county's own witnesses say that that's basically based on their skills. They could point to no written documents, they could point to no law or regulation that supports that interpretation. So read together. I'm not totally sure I'm following that. So I get the museum story, different plan, different set of circumstances, but I'm I'm looking at the particular plan that we had, the BCNP plan, and it says yes this supports the use of, you know, sewer consistent with the plan, but no sewer under any circumstance for rural edge properties, right? And what I don't see is any analogous master plan that specifically identifies the very property you're asking about and says, oh absolutely not there, but then turns around and is allowed. I would refer your honor to, again we discussed the Glamstone Museum, where there is a specific recommendation saying that access that... Wasn't that a different master plan? It was a different master plan, but it's not the master plan that is at issue here. It is the denial of the application under the PIP policy, which the county... Well what we think you look at the master plan, not this PIP policy, which is merely a part of the master plan. Your honor, that we have two different claims where this is implicated. The first being our substantial burdens claim, and that goes to the reasonable expectation, and the question is would an applicant in their position reasonably expect that given the county's practices with respect to their plans? What about the fact that the church's own real estate agent said that Tom Norris keeps insisting that we will have no regulation issues getting water and sewer. I so far have gotten different information from the county. That's what the church's own real estate agent said, so how could there be a Well there's two issues there, your honor. First is if the county is telling them one thing that is contrary to their own regulations, then I don't think a RLUIPA claimant can be said to not, you know, not have a claim under the substantial burden provision just because the county said something wrong to a potential applicant. The second is if the county, even assuming that the county didn't want this church or didn't want this property being developed, I think, and I'm not talking about a non-discrimination claim here, but if there was some sort of hostility towards a particular property owner or property being developed for whatever reason, that seems to fly in the face of the purposes of RLUIPA, which are to protect these these kinds of uses, protect against hostility, and to be read broadly according to its rules of construction. But with respect, and I want to answer the rest, finish my answer with respect to the other master plan, with respect to our equal terms claim, we use the Glensville Museum as a similarly situated, and the issue there is not, you know, the court has not had an equal terms case yet, but looking at other circuits, other circuits look at what they call either the regulatory purpose or the regulatory criteria. Courts have looked where you have an as-applied type challenge where there's a denial. What is the reason for the denial? And the reason for the denial here was not this plan is different from that plan. The reason for the denial was there was a specific recommendation against sewer service for this particular property, and with the Glenstone property that's exactly the case as well. It said we specifically exclude properties adjacent to and in the vicinity of the lower Greenbrier branch properties. That is a specific targeting of specific properties in that master plan, similar to the reference to the rural edge properties, and that the county understood it. The county understood that that plan, that the Potomac plan, recommended against approval and had a specific recommendation against approval there, but it was still granted, and when it went up to the MDE, the MDE actually reversed part of it. They said, well, you can't have sewer access. Weren't all the contracts for this property contingent on this very issue? Yes, they absolutely were, and this is another. All right, so then can you deal with our opinion in Andon, which says that where the parties knowingly entered into a contingent lease agreement for a non-conforming property, their burdens are self-imposed hardships? Well, that would set up, Your Honor, I don't believe that that speaks to a reasonable expectation. Either the laws allow the must take the risk and not enter into a contingency provision, which is just common sense, or else he might lose. Are you saying that Andon was incorrect or just that it doesn't apply here? I'm saying that the holding of Andon was that the use was not permitted on the property there. The property did not meet the specific criteria for a church in Andon, and that the plaintiff should have known that and did know that beforehand, and so they had no reasonable expectation, as opposed to this case where the specific regulations that issue do permit the use. That's the distinction between our case and Andon. Well, except for the part of the regulations that Judge Richardson has read a couple times. And again, the way that if there is any inconsistent inconsistency, the way that that has been resolved by the county itself and by the state, by Maryland Department of Planning, by MDE, is to read them together and to acknowledge that a sniff use does get the benefit, even if there is a specific recommendation to that specific property. And looking at it in the abstract is also a little beside the point. The question is, would an applicant at the time of buying the property, submitting the application, knowing, I guess, what a reasonable property owner would know, and seeing that the county has interpreted in this way in the past, and seeing the text of the provision, believe, or at least reasonably believe, that they could have access to tour in those. And I think that there's no question here that they would, regardless of what county officials might have been saying in an attempt to sell the property, the regulations are still what they are. Before you finish here, I want to know what you want us to do with this case. What do you want us to do? What's the result you want on each claim? Your Honor, I believe that the district court's decision should be reversed on our equal terms claim, that there is no question that we are entitled to relief under that, and I think at that point, at least the liability question of that claim is over. Alternatively, because the court did not rule on the property... By reversed, and you say it's over, do you want a trial, or do you want summary judgment in your name? What do you want? I believe we were entitled to a summary judgment on that claim. So you want the summary judgment that you lost, vacated, and then you want a summary judgment award in your behalf, is that correct? With respect to our equal terms claim under RLUPA, yes, Your Honor. That's correct. You want summary judgment. You don't want a trial, you want summary judgment. Okay. With respect, I'm sorry, Your Honor, my time is over. May I finish? I still want you to tell me what you want. Go ahead. With respect to our RLUPA substantial burdens claim and free exercise claim, because there has been no ruling on the compelling governmental interest, least restrictive means questions, we believe that vacating the district court's opinion and remanding for further proceedings would be appropriate. What would these further proceedings consist of that you want? Well, I believe that it would either be a further briefing on the compelling interest, fixed scrutiny analysis, or a trial on those issues. I think that the district court would have to make that decision. And you want the district court to decide what to do then? You don't have a specific request? Well, we believe that there are no genuine issues of material fact. As we argued down below, the district court did not make any decisions on those aspects of our claims based on its decision on the other elements. So we believe that we were entitled to summary judgment on those issues. Okay. Is that all you have to say on that? Anything else, Dr. Richardson? No, sir. No. Let's see if you were saying some time, sir. We'll hear from Mr. Feldman. Thank you, Judge Keene. May I please report? My name is Howard Feldman, and I represent the appellees, Montgomery County, Maryland, Montgomery County Council, and former county executive. There's a lot to unpack. And I'm a big believer that context is everything. So I want to give some context to the claims, and then I'm going to address head-on points that Mr. Storrs has discussed regarding VCMP, Glenstone, and plaintiff's appellant's equal terms. It's important to understand that this case is here today as a result of the plaintiff's effort to manufacture a claim for nearly a decade. After years and years of unsuccessful efforts to develop their properties for mostly secular purposes, 10 years ago, the landowners embarked on a campaign while the VCMP was still being drafted and considered by the county council. They wanted to up-zone their properties to permit development, high-density townhouses, and determined ahead of time that if their effort failed, their plan B would be to go out, find a church, and bring a church to it and seek sewer for the church, because they believed VELUPA would immunize them and allow them to circumvent the county's neutral land-use regulations. There's an email. If I say JA, I'm referring to the Joint Appendix, JA 1875, ascribed to Plan B, and JA 2361, after the fact, Mr. Norris says, I warned them that if they refused townhouses, there would be churches on this land. And so these claims had been manufactured beginning with that threat, and after the townhouses were denied, making good on their threat, landowners went out, found a church, and entered into a series of contracts. And the interesting thing here is there was a 2013 contract which was entered into with Canaan, and Canaan terminated that contract as it was permitted to. After investigating the property, like in Andon, it made informal pre-submission inquiries of county personnel charged with processing water and sewer category chain requests. And their real estate broker, as the court observed, reported that county personnel expressed huge doubts that sewer would be approved based on the language of the BCN. And they sent an email. And the emails are at JA 2513, JA 2490, that say... The county, Mr. Storza refers, they refer the court, and it's in their briefs, to one page of the BCNP. And that's page, Appendix page 709, Judge Richardson looking at. And they refer, and that is the only page that they refer the court to. To substantiate an argument that Canaan and the other plaintiffs had a reasonable expectation that sewer would be approved. Judge Richardson was spot on. A sentence that says, generally, that the plan supports the use of sewer. There's a sentence, the very next sentence in the BCNP, beginning with the words, the 1997 Fairland Master Plan, right after the sentence referred to by appellants, talks about how the prior master plan had opened the door to the possibility that one of the properties that issue, it's referred to here as the Benderley property. And that's the property owned by Appellant Burtonsville Associates. The prior master plan opened the door to the possibility that that property might get sewer for a special exception use. And that very page goes on to say, this plan is closing the door to that possibility because it's recommending against public sewer for any circumstances. And in pointing out that single page of the BCNP, what else do appellants do? They ignore several other references to their properties on page JA 692, 694, and 695, which say, in no uncertain terms, new development to the rural edge neighborhood will be without public sewer. No sewer extensions beyond the commercial neighborhood. And no public sewer should be permitted for any secular or religious. There is no way to reconcile the language of the BCNP and the state law requirement that amendments to the water and sewer plan be consistent with the master plan and extend sewer to these properties. And what better is there to look at what the plaintiffs, the appellants actually expected at the time is their own contemporaneous writings. Not what they're saying now after the fact. Their own contemporaneous writings say, for example, when Canaan terminated the 2013 contract. They said after thorough discussions with attorneys and the county, their own attorneys they discussed this with, and their own assessment of the BCNP, they terminated the contract. That's what they told the landowners at JA 2513 and 2490. And then notwithstanding that nothing had changed, inexplicably, Canaan entered into a new contract in 2014. And again, what better to look at in their contemporaneous writings to know what they were expecting, what happened. That contract begins at JA 2515, and the recitals to it are very telling. Recital D has an acknowledgement that the properties as they are could not accommodate the church's intended use. Recital E says the sellers recognize, and they're telling the purchaser in this recital of the contract, that the church as a contract purchaser, by virtue of the LUPA, not by virtue of any county regulation, but by virtue of the LUPA, brings to their contract a benefit and value which would not otherwise be available to the sellers. And absent having a church as the buyer would probably consign the property to very limited single family development or parkland. And that's what they've been complaining about for years. They're saying this property under county regulation is not developed. And that's what Burtonsville Plussing complained about to the Maryland Tax Court years earlier, even before the BCMP. What they're saying here is that Canaan helps us circumvent the county regulations because of the LUPA. Recital F says that there was value added by the role of the church as a purchaser. What was that value? Well, that's answered by Section 7, which characterizes Canaan as the protectorate of the LUPA. And, as Judge Thacker noted, just like in Andan, Canaan protected itself with a contingency in the contract. But more than that, in Paragraph 2A and the contingencies in Section 8, Paragraph 2A has an express agreement to sue because they all expected that the request would be denied based on the BCMP. Now, in those efforts to manufacture nonexistent claims that they didn't expect would prevail based on county regulation, that continue today, appellants misrepresent the factual record, pivot from arguments made in the district court to new arguments made here, and ignore relevant language in two master claims. I've just described to you all of the language in the BCMP that they ignore. And they can see there is a state law requirement that makes the recommendations set forth in the BC mandatory, legal. State law prohibits the county from adopting an amendment which would be inconsistent with master plan language. And there's no way to reconcile extending service to these properties far into the Texas Reservoir where service was never as being consistent with master plan. The BCMP was intended to close the door on any possibility of sewer being extended to these properties. And so far as the equal terms claim is concerned, Mr. Storza points to Glenstone. And again, they're changing their tune from what they argued for the district court. The two relevant bullets from the master plan, which is a different master plan in a different part of the county. It's called the Potomac Subregion Master Plan. And it's not even part of the record because the plaintiffs didn't make it a part of the record. But the two relevant bullets are verbatim of JA 4142, which is a report by the county's land use expert. And the two bullets, the first bullet on that page, JA 4142, says that sewer is allowed in certain areas. Generally says that sewer is allowed in certain areas. The second bullet is what they focus on. The first sentence of the second bullet allows sewer in certain areas outside of the sewer envelope at the periphery of. The second sentence, which begins with the word exclude, says that sewer is nonetheless not permitted in certain areas of the periphery. And appellants now argue that the exclude sentence is comparable to the absolute sewer prohibition in the BC Act. That's why they think it's comparable, because of that sentence. But interestingly, below, and it's in their memorandum for the district court, and it's ECF 133-2 to page 48. They said affirmatively that Glenstone is not in the periphery. Meaning there's no evidence in the record supporting their current assertion that Glenstone is even in the geographic area. It's addressed by the second bullet because it simply is not. Or stated another way, the Glenstone property could not be excluded from something that it was never a part of in the first place. Thus, the district court was spot on at page 47 of its opinion. When it said that it's applied to Glenstone, the Potomac plan lacked any of the BCMP's specific language, which effectively barred public sewer in the relevant area. The Glenstone master plan is different. The plaintiffs acknowledge below that the second bullet that they're focusing on now doesn't even apply to Glenstone. It's not in the geographic area of the periphery. There's no evidence in the record other than argument by counsel to the contrary. Another misrepresentation that they're making now is at page 27 of their reply where they state that the county argued that the landowner plaintiffs lacked standing to assert an equal terms claim and the district court rejected that. That statement is absolutely wrong for two reasons. First, we didn't make a standing on it. What we were saying is that insofar as the landowner plaintiffs, who are plaintiffs in their own right and have to prove the elements of their claim, an element of their claim for an equal terms claim is to show that they're a religious institution and they can't do it. So what we were saying is they couldn't prove an element of their claim. And the district court at page 23 of it, which is a JA 4872, acknowledged the argument they were making and noted that several courts have in fact found that one element of an equal terms claim is that the plaintiff must be a religious institution. But it never came back to that argument because its other rulings were dispositive of equal terms. I want to address briefly the free exercise claim because there are some new arguments made in the reply brief that we haven't had a chance to address. And they're important. And they make essentially, appellants make essentially two arguments in support of their free exercise. First, they argue, and I really don't understand the argument, but they argue that they need not be burdened. Well, that's just contrary to case law. In Employment Division versus Smith, the Supreme Court stated clearly that government actions that substantially burden religious practice must be justified by controlling government interests. 494 U.S. at 883. Cuomo, the recent Supreme Court decision relating to the pandemic, doesn't support their assertion that no burden must be shown. Because in the context of assessing whether an injunction should issue, which was done in Cuomo, the Supreme Court made an express finding that the governor's executive order restricting attendance at religious services would irreparably harm congregants who did not attend services. So they must show substantial burden. And for the same reasons they can't show substantial burden on their RLUIPA claims, because all of their harm is self-implicated by going forward with a contract that they knew would fail. They have no burden to support their free exercise. They also argue that the rational basis of deduction applied to the free exercise claim, which again is simply contrary to finding. They argue, I'm sorry, strict scrutiny should apply in contrast to the rational basis review that was applied to the district court. In applying rational basis review to a free exercise claim, this court in Bethel, and I believe Judge Thackeray was on it, explained that under the free exercise clause, a law that is neutral and of general applicability need not be justified by compelling government interests. Even if the law has the incidental effect of burdening particular religious practice. And further, that a law is neutral unless its object is to infringe upon or restrict practices because of the religious condition. Rational basis review applies here because the BCMP prohibition against sewer for any use is not targeted at religion or religious practices. In fact, it was adopted in the face of a request to build townhouses. And it is neutral and generally applicable in that it applies for any use. Below and here, appellants acknowledge that the BCMP was the sole basis for the denial of the sewer. They may be changing their argument, but in three places they've acknowledged that the BCMP was the sole basis for the denial. Docket 133-2, page 8, note 3. In their statement of facts below in paragraph 179 of JA 283, and in their brief here, their opening brief, page 19, note 5. And thus the focus of their argument below was that the BCMP targeted church use. And the district court characterized their targeting argument as a misrepresentation of the facts in light of the vigorous townhouse campaign they embarked upon during the BCMP process. There simply was no evidence that any challenge decision by the county in this case was made that targeted religion or religious practice. Nor here was there any individualized assessment that might be subject to strict scrutiny. In Smith, the Supreme Court wrestled with whether and when to apply strict scrutiny. And therefore deemed presumptively invalid generally applicable laws which impose civic obligations which are of societal importance. And the Supreme Court there cautioned that a private right to ignore that strict scrutiny, I'm sorry, is not a private right to ignore generally applicable laws. 494 U.S., 87 through 89. All of the cases in which there have been individualized decisions involved, as the Supreme Court explained its earlier decision in Sherbrooke, that was developed in the context that lent itself to government assessments of the reasons for relevant conduct. Indeed, recently in the Fulton case this year, the Supreme Court said that the creation of a formal mechanism for granting exceptions renders a policy not generally applicable because it invites the government to decide reasons for not complying with a policy. Well, here there simply is no exception or system of exceptions which invited Montgomery County to consider conduct or make assessments based on different applicants, who they were, or what they did. And so strict scrutiny absolutely should not apply to this case. The District Court was absolutely correct to find rational basis for review because there was no such system of individualized assessments in place. And the BCMP took away any discretion there was. In conclusion, I see my time is up. I thank you for the Court for its time. I ask that the Court affirm the carefully considered District Court and respectfully request again to affirm the District Court's decision. Thank you. Thank you, Mr. Feldman. Mr. Strozier, you have some rebuttal time. Thank you, Your Honor. I would like to address the point regarding Glenstone Museum that was made by my counsel. I would refer the Court to page 3989 of the Joint Appendix. And see PPC initial comments on Glenstone. It relates. It's the evidence demonstrating that the property was subject to the specific restriction, which is in the record at least three times, including in the plan itself, which the Court can take judicial notice of. It specifically excluded properties adjacent to and in vicinity of the lower Greenbrier branch properties. This property confronts the Greenbrier properties, thus would not qualify in the peripheral sewer and service policy. On the next page, footnote 11, quote, this property confronts the lower Greenbrier branch properties shown on page 83 of the Potomac plan. It is therefore excluded from the peripheral sewer policy. That's page 3990 of the Joint Appendix. And in the statement of facts that was submitted, page 324, paragraph 412 discusses the same issue. So these facts were certainly in the record. With respect to the other unsuccessful applications, the deferred and denied applications. Are you saying then that Glenstone is in the periphery? He says it's not in the periphery, your opponent. Do you hear me? It is adjacent to the lower Greenbrier branch. Mr. Feldman said, I think he was referring to the very same thing you are, Glenstone is not in the periphery. And you now are referring us to a statement about the periphery, but you're not saying that he's wrong. Are you? Yes. Are you? Is he wrong or right? I may be getting a little lost here, Your Honor. But the point is that it was not disputed that the specific recommendation against access applied to the Glenstone Foundation. I think that's the critical issue. Do you know the answer to the question of whether the museum was in the periphery or not? It's in the periphery and excluded from the sewer. And the site that you give that, that it's in the periphery is what? Page 3990. Now, is that page 23 of the Potomac sub-region master plan? No, it's not, Your Honor. That's in the comments application. I would like to bring up the other proposed uses that were deferred or denied. None of them were PIFs, not even the other church that applied. None of them were done under the PIF policy. With respect to the issue of Andon, the discussion with respect to the contingent lease agreement in the court's opinion there, specifically talked about cited Petra Presbyterian Church and said, because the plaintiff purchased property with knowledge that the permits to use the property for a church would be denied, the plaintiff assumed the risk of having to sell the property. Again, it was not the fact that they had entered into a contingent contract. It's the fact that they did so knowing that the use was not permitted. I think that's the essential point there. But it strikes me that the various provisions and recitals and agreements to sue in the 2014 contract are evidence of that knowledge, no? They are evidence of the knowledge that it may be difficult. And this is where we get to the crucial point here. If the regulations allow the use, but you have a local government that nevertheless does not want the use there, their officials do not want it for whatever reason. We have not appealed our other claims alleging discrimination here. But if the use is not wanted, but the regulations permit it, they didn't change the ECMP. They could have done that. They didn't change the water and sewer plan. They could have done that. But those plans allow this use, knowing that government officials are hostile to it, and therefore you don't have a claim. That can't possibly be the standard of RLUIPA. All that has to happen. I see my time is up, Your Honor, so I thank you very much. Go ahead and finish your thought. My thought was for a government to simply avoid the strictures of RLUIPA by simply saying we don't want you, regardless of what our regulations say, and therefore you can't have a reasonable expectation because you may expect litigation, because you may introduce a contingency contract. That cannot be a broad construction of RLUIPA's claims. Very good. Judge Thacker, Judge Richardson, either of you have any further questions? I do not. I do not. Thank you, Your Honor. Thank you very much for your arguments. We will take this case under advisement.
judges: Robert B. King, Stephanie D. Thacker, Julius N. Richardson